RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0158p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JEFF L. KEAN,

                  *Plaintiff-Appellant*,

    *v.*

BRINKER INTERNATIONAL, INC. and BRINKER
INTERNATIONAL PAYROLL CO., L.P., dba Chili's Grill
& Bar; CHILI'S, INC.,

                  *Defendants-Appellees*.

No. 24-5514

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00885—Aleta Arthur Trauger, District Judge.

Argued: April 30, 2025

Decided and Filed: June 17, 2025

Before: SUHRHEINRICH, MOORE, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Emma Freeman, APOLLO LAW, LLC, Brooklyn, New York, for Appellant. Jennifer S. Rusie, JACKSON LEWIS P.C., Nashville, Tennessee, for Appellee. **ON BRIEF:** Emma Freeman, APOLLO LAW, LLC, Brooklyn, New York, Donna J. Mikel, MIKEL & HAMILL PLLC, Chattanooga, Tennessee, Adam W. Hansen, APOLLO LAW LLC, Minneapolis, Minnesota, for Appellant.

───────────────

## OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge. Plaintiff Jeff L. Kean was fifty-nine years old and working as a General Manager at one of the most profitable Chili's restaurants in the

Nashville, Tennessee market when he was terminated and replaced by a thirty-three-year-old with no managerial experience. Defendants Brinker International, Inc.,[1] Brinker International Payroll Co.,[2] and Chili's, Inc., (together "Brinker") explain that Kean was terminated for creating a toxic "culture" and not "living the Chili's way." According to Brinker, "culture" at Chili's meant treating employees well, satisfying guests, and turning a good profit—among other intangibles. Despite Brinker's explanations, by all objective metrics, Kean's restaurant was one of the top performers in his market. Not only was the restaurant profitable, but also it had operated for years as a training center for other managers, and Kean had consistently positive ratings as a manager from his employees.

So why did Brinker fire Kean? The answer is complicated. No one at Brinker can remember why they actually fired Kean, and Brinker destroyed all original documents related to Kean's employment and the reasons for his termination. Kean tries to fill in the gaps with his own theory. According to Kean, Brinker used "culture" as a catchall term to obfuscate their systematic efforts to remove older employees in favor of younger ones. In his estimation, he was fired because he was the oldest manager in his region and did not fit into Brinker's business model aimed at attracting millennial guests. Based on this theory, he filed this suit under the Age Discrimination in Employment Act ("ADEA"). Ultimately, the district court credited Brinker's explanation, granted summary judgment in Brinker's favor, and dismissed the case.

For the reasons that follow we **VACATE AND REVERSE IN PART** and **AFFIRM IN PART** the district court's decision, and **REMAND** for proceedings consistent with this decision.

## I. FACTS AND PROCEDURAL HISTORY

### A. Factual Background

#### 1. Events Leading to Kean's Termination

In May 2011, at age fifty-one, Kean was hired to work as General Manager ("GM") at a Chili's restaurant in Nashville, Tennessee. *Kean v. Brinker Int'l, Inc.*, No. 3:22-cv-00885, 2024

---

[1]d/b/a Chili's Grill & Bar.

[2]d/b/a Chili's Grill & Bar.

WL 1815346, at *15 (M.D. Tenn. Apr. 25, 2024).  As GM, Kean managed employees, sales, turnover, guest experience, and the day-to-day operations of the restaurant.  *Id.*  GMs like Kean were directly managed by a "Director of Operations" ("DO").  *Id.* at *16.  Among other tasks, DOs conducted annual performance reviews of GMs, initiated employment decisions such as terminations, and maintained personnel files.  *See id.* at *2, *13.

In 2015 or 2016, Kean's then-DO Allen Pitts, transferred Kean to a different restaurant in Murfreesboro, Tennessee.  *Id.* at *16.  The Murfreesboro Chili's experienced high turnover and other problems with sales and guest experiences.  *Id.*  Pitts transferred Kean to the Murfreesboro Chili's because "they wanted [Kean] to go fix it."  R. 48-1 (Kean Dep. at 17:5–19) (Page ID #1106).  During the relevant time period, Eric Bean worked as one of Kean's three assistant managers, and Bean essentially operated as Kean's second in command.  *Kean*, 2024 WL 1815346, at *16.

Around late 2017 or early 2018, Kean's then-DO, Tom Mallindine, made Kean's restaurant a training location for Managers in Development ("MIDs").  *Id.*  This was a sign that Kean had turned around the troubled Chili's location, because only high performing restaurants could be selected as a training location.  *Id.*  Under Mallindine's supervision, Kean earned consistently positive reviews and received a performance-based raise each year.  *Id.*

Kean was one of the oldest managers in the region and reported that he would receive comments about his age from other GMs, comments like "Old Man," "Pops," "Grandpa," and that his management style was "old-school."  R. 48-1 (Kean Dep. at 34:21–35:7, 37:6–11) (Page ID #1118–19, 1121).  Although none of these comments were expressly derogatory, Kean understood them to mean that "the old-school methods of management would no longer work with the younger group of employees the defendants were hiring . . . ."  *Id.* at 37:21–38:7 (Page ID #1121–22).[3]  During this same period, Kean, Bean, and Mallindine noted a trend of Brinker terminating older employees and replacing them with younger ones.  R. 34-3 (Mallindine Decl.

---

[3]There is also the matter of the Chili's employee handbook that makes two passing references to millennials, which Kean argues fits into his narrative that Brinker sought to replace older employees.  R. 34-5 (Chilihead Handbook at 1–2) (Page ID #202–03).

¶ 29) (Page ID #189); R. 34-4 (Bean Decl. ¶ 46) (Page ID #195); R. 48-1 (Kean Dep. at 33:16–34:8, 44:6–22) (Page ID #1117–18, 1127).

Around the time of Mallindine's departure in September 2018, Rich Kissel was the Vice President of Operations ("VPO") of the region that included the Nashville market. *Kean*, 2024 WL 1815346, at *16. As VPO, Kissel oversaw all DOs within his region. *Id.* Kissel promoted then-GM Marsha Gilbert to replace Mallindine as the DO overseeing the Nashville market, including Kean's restaurant. *Id.* Early in her tenure—around mid-October 2018—one of Gilbert's friends, Melissa Stonestreet, was assigned to Kean's restaurant as a MID. *Id.* According to Kean, Stonestreet complained about Kean's management to Gilbert. R. 48-1 (Kean Dep. at 58:9–25) (Page ID #1139). This marks the beginning of the events leading shortly to Kean's termination.

In response to the Stonestreet complaint, Gilbert told Kean that "she was pulling the training function from [his] store due to complaints she had received" from Stonestreet. *Id.* at 58:16–21 (Page ID #1139). "She said she would look at recertifying the restaurant later." *Id.* at 58:24–25 (Page ID #1139). When Kean received the call, he was at his daughter's "school in a gymnasium full of adults and kids[.]" *Id.* at 59:10–12 (Page ID #1140). He called Gilbert back shortly thereafter and explained that he thought it was "unprofessional" for her to call him on his day off and that it was "disrespectful to [his] staff and [him]self [who] had worked so hard to train the trainees," especially "[w]ithout her ever being in the restaurant . . . ." *Id.* at 59:16–25 (Page ID #1140). Following this phone call, no one at Brinker followed up to investigate the complaint, and Gilbert never reported the complaint to Brinker's HR (known as the PeopleWorks Department). *Kean*, 2024 WL 1815346, at *16. Both Kean and Bean remember Stonestreet as having problems with taking direction from management. R. 48-1 (Kean Dep. 55:16–56:25) (Page ID #1137–38); R. 34-4 (Bean Decl. ¶¶ 22–29) (Page ID #193–94).

On November 17, 2018, Gilbert reported to Kristin Stofer, a Team Member Relations ("TMR") Specialist, that Gilbert had received a complaint from one of Kean's employees, named Rondale Brown, regarding Kean. *Kean*, 2024 WL 1815346, at *17. Stofer, as a TMR Specialist, worked as part of Brinker's HR department dealing with employee complaints. *See id.* at *2, 6. Stofer's investigation of Brown's complaint revealed that Brown was a server at Kean's

restaurant, and Brown believed Kean had wrongfully terminated Brown.  *Id.* at *17.  Brown complained about Kean's management style, that the restaurant was "very tense and stressful," that he was treated poorly, and that another employee had told Brown that "the GM was being racist towards [Brown].'"  R. 34-10 (TMR Report at 8) (Page ID #283).  In her investigation report, Stofer explained that although Kean had received complaints in the past for hostile work environment, no complaints were substantiated, and that Kean had one document on file where he was coached on an issue in September 2018.  *Kean*, 2024 WL 1815346, at *17.

Based on Stofer's response, Gilbert and Hector Aponte—the HR person assigned to Kean's region—agreed after a phone call to terminate Kean.  *Id.* at *17 (citing R. 34-10 (TMR Report at 7–8) (Page ID #282–83)).  Gilbert referenced "guest and team member complaints, as well as, the MID training concerns," as justifying the termination.  R. 34-10 (TMR Report at 7) (Page ID #282).  Gilbert planned to replace Kean with Bean.  *Id.*  Bean was then thirty-three years old.  *Kean*, 2024 WL 1815346, at *20.

Later that same day, Stofer expressed concern that there was insufficient documentation of efforts to approach Kean about the complaints and that Brinker had not yet done "everything [they] could to set him up for success prior to moving to termination."  R. 34-10 (TMR Report at 7) (Page ID #282).  No one responded to Stofer's concern.  Two days later, on November 21, 2018, Stofer followed up and asked if Gilbert and Aponte had come to a resolution on Kean and Brown.  *Id.*  Aponte responded that "[w]e've aligned to term Jeff Kean," but did not comment on Kean's decision to terminate Brown.  *Id.* at 6–7 (Page ID #281–82).

Aponte confirmed his and Gilbert's decision without learning additional information about the Brown complaint, visiting Kean's restaurant, or discussing Kean's management with his employees.  *Id.*  Five days later, on November 26, 2018, Stofer emailed Aponte, Gilbert, and Kissel to inform them of her investigation into Brown's complaint.  *Id.* at 6 (Page ID #281).  Kean told Stofer that Brown had been coached by Kean previously, that Brown would repeatedly leave for a smoke break without permission, and that "[Brown's] scores were not great either but he would neglect his tables and wouldn't take feedback at all."  *Id.*  Stofer concluded that Brown's termination could be upheld "based on insubordination/negative confrontation with manager and performance concerns."  *Id.*

On November 27, 2018, Gilbert visited Kean's Chili's restaurant and terminated Kean because management wanted to change the culture at his restaurant. This was the first time Gilbert visited Kean's restaurant. *Kean*, 2024 WL 1815346, at \*18. Kean told Gilbert that she could not have known the culture at his restaurant because she had never visited or met with his employees. *Id.* (citing R. 48-1 (Kean Dep. at 61:10–15) (Page ID #1142)). "As Kean was leaving, he told Gilbert, 'I'm not sure who promoted you or why you've been promoted, but I can tell you that you're not going to last very long when you're making decisions like this.'" *Id.* (quoting R. 48-1 (Kean Dep. at 63:9–15) (Page ID #1144)). By this comment, Kean meant that "[s]he had just fired her best manager doing all her management training in her market." R. 48-1 (Kean Dep. at 63:9–15) (Page ID #1144).

When Kean was terminated, his Key Performance Indicator ("KPI") Reports[4] and scores on employee engagement surveys, called MEE surveys ("My Employment Engagement"), were both excellent.[5] *Kean*, 2024 WL 1815346, at \*18. It is undisputed that Brinker's decisionmakers did not rely on any of these reports and surveys when terminating Kean. Neither Gilbert nor Kissel knew Kean's exact age when they made their termination decision. *Id.*

### 2. Events Following Kean's Termination

Following his termination, Kean was replaced as GM by Bean, who was thirty-three years old. *Id.* at \*20. The day after Kean's termination, on November 28, 2018, Kean called Stofer to complain about wrongful termination and age discrimination. *Id.* at \*19. In what appears to be either an actual email or draft-email preserved as a note, dated November 28, 2018, Stofer again expressed her concerns about the nature of Kean's termination. R. 34-10 (TMR Report at 5–6) (Page ID #280–81). Kean had apparently told Stofer that he was fired based on "culture" but that he never received any complaints from his team members or assistant managers. *Id.* He also expressed that, prior to his termination, no supervisor expressed any concerns about the workplace environment at his restaurant. *Id.* In light of Kean's complaints,

---

[4]KPI Reports measure the financial success of a Chili's restaurant, by measuring, in part, "turnover, sales, guest experience, and cost." R. 34-4 (Bean Decl. ¶ 11) (Page ID #192).

[5]"Once or twice a year, Brinker would ask store employees to participate in the MEE survey. This was a survey in which employees would comment on and rate their experience working in the restaurant." R. 34-4 (Bean Decl. ¶ 13) (Page ID #192).

Stofer expressed once more her view that Kean's documentary record did not necessarily support termination. *Id.*

As part of a note Stofer drafted summarizing a conversation between her and Aponte, Aponte explained that the decision was based on Kean "creating a very toxic environment so much so that they had to pull training from the restaurant." *Id.* at 5 (Page ID #280). Because the issues were multifaceted, Stofer noted that Aponte explained that no additional coaching could fix the "culture." *Id.* Other individuals—who were contacted after the decision to terminate Kean was made—confirmed that there had been some number of previous team-member and guest complaints. *Id.* at 4–5 (Page ID #279–80). It is undisputed that there is no documentation supporting the existence of any of these previous complaints. *See Kean*, 2024 WL 1815346, at *9–14 (discussing spoliation).

Ultimately, as described in a note dated November 30, 2018, Stofer communicated to Kean that "with the background and current guest concerns, [team member] concerns and concerns with not living the Chili's way and living our culture the decision was made to separate employment." R. 34-10 (TMR Report at 4) (Page ID #279). Kean responded that Stofer did not clarify for him the reasons for his discharge given the lack of documentation, and that he would "get to the bottom of this with his attorney." *Id.*

### 3. EEOC Charge and Spoliation of Evidence

Kean filed a charge of age discrimination with the EEOC in March 2019. The EEOC issued a Notice of Determination in June 2022. *Kean*, 2024 WL 1815346, at *21. The EEOC determined that Kean "had no record of disciplinary actions or warnings in his personnel file." R. 34-13 (EEOC Determination) (Page ID #319). This is because Brinker failed to maintain its electronic files documenting complaints (if any) made about Kean, any of his performance reviews, and any of the emails exchanged between Stofer, Aponte, Gilbert, and Kissel related to Kean's termination. *Kean*, 2024 WL 1815346, at *9–14. During the relevant time period, Brinker did not implement a uniform document-retention policy. *Id.* at *3. Although Brinker issued a litigation hold to preserve important emails related to Kean's termination, the hold was not issued until April 2019, and all original emails were destroyed. *Id.* at *7.

Compounding the destruction of relevant evidence, not one of the involved management team—Stofer, Aponte, Gilbert, and Kissel—has any independent recollection of either their role in terminating Kean or why the decision to terminate was made. R. 45-3 (Stofer Decl. ¶ 4) (Page ID #1041); R. 34-6 (Kissel Dep. at 133:2–23, 134:10–22, 135:19–24, 154:1–22, 155:15–156:4) (Page ID #219–21, 225–27); R. 34-8 (Gilbert Dep. at 108:1–18) (Page ID #266); R. 34-18 (Aponte Decl. ¶¶ 4–6) (Page ID #398). The only individual with any independent recollection of the relevant events is Kean himself.

The main piece of evidence that supports Brinker's version of events is the TMR Report. R. 34-10 (TMR Report at 3–11) (Page ID #278–86). But, as explained later in this opinion, no one can adequately explain the nature and origin of this document. The document appears to have been created by Stofer after Kean submitted his complaint to Brinker's HR. R. 34-10 (TMR Report at 9) (Page ID #284). The TMR Report is apparently a compilation of personal notes drafted by Stofer and copies of emails circulated among Stofer, Aponte, Gilbert, and Kissel. *Id*. at 3–11 (Page ID #278–86). The document was not turned over to the EEOC as part of its investigation. *Kean*, 2024 WL 1815346, at *2 & n.4.

### 4. Living the Chili's Way

As a final point of preface, it is worth briefly discussing what "culture" means at Chili's. As explained by the district court, "culture" covers such disparate topics as how to handle team members, metrics at the restaurant, employee turnover, employee attitude, and guest experiences. *Kean*, 2024 WL 1815346, at *15–16. According to Brinker, the TMR Report provides sufficient evidence demonstrating that Kean was not "living the Chili's way," by creating a toxic culture at his restaurant. R. 34-10 (TMR Report at 4–5) (Page ID #279–80).

The only other evidence in the record describing the "culture" at Kean's restaurant prior to his termination paints a different picture. In October 2018, according to Mallindine, Kean's restaurant "was ranked as the 3rd highest performing store in [his] market." *See* R. 34-3 (Mallindine Decl. ¶ 7) (Page ID #188). "These metrics included employee turnover, sales, guest experience, and cost." *Id.* ¶ 6 (Page ID #188). Kean's ratings by his employees were also positive. *Id.* ¶¶ 8–9, 16, 23–24 (Page ID #188–89). Bean confirms that Kean's restaurant "was a

top performing store in its market in terms of the metrics used by Brinker" during the relevant time period. R. 34-4 (Bean Decl. ¶ 5) (Page ID #191). "[F]rom June 27 to end of December 2018"—with Kean's termination on November 27, 2018—"[b]ased upon all KPI indicators including turnover, sales, guest experience, and cost, [Kean's restaurant] was the second highest performing store in the market . . . ." *Id.* ¶ 11 (Page ID #192). Bean's declaration also supports the view that Kean had positive relationships with his employees. *Id.* ¶¶ 4, 13–14, 20–21 (Page ID #191–93).

Kean's positive culture at his restaurant is reflected in his May 2018 MEE Survey, which was completed by forty-six employees. R. 48-12 (MEE Survey at 1–2) (Page ID #1336–37). Kean apparently exceeded every objective managerial benchmark set by Chili's for a MEE Survey. *Id.* at 1 (Page ID #1336). In the subjective/qualitative portion, entitled "**Culture Comment**," employees left mostly positive reviews of Kean ("Cared for," "Thriving," "positive," "Fun," "Fair," "Family," etc.). *Id.* at 2 (Page ID #1337).

## B.  District Court Proceedings

Kean filed suit in November 2022, alleging age discrimination in violation of the ADEA. *Kean*, 2024 WL 1815346, at *21. Prior to the close of discovery, Kean filed a motion for sanctions and/or to exclude the TMR Report based on Brinker's spoliation of evidence. R. 34 (Mem. in Supp. Mot. for Sanctions at 1) (Page ID #134). Following the close of discovery, the parties filed cross-motions for summary judgment. R. 40 (Kean Mem. in Supp. of Mot. for Summ. J.) (Page ID #486); R. 43 (Brinker Mem. in Supp. of Mot. for Summ. J.) (Page ID #586). The district court resolved all three motions on April 25, 2024. *See Kean*, 2024 WL 1815346, at *1.

The district court granted in part and denied in part Kean's motion for sanctions. *Id.* The district court found that Brinker was on notice that Kean intended to pursue litigation as of November 28, 2018, when he called Stofer and informed her that he was getting a lawyer. *Id.* at *8–14. Brinker failed to maintain all original electronic material related to Kean's employment—including any alleged complaints made against Kean and all of his performance reviews. *Id.* This is because Brinker failed to implement a consistent document-retention policy

and failed to implement a litigation hold.  *Id.*  The district court granted Kean's motion to the extent he sought fees and costs, but denied it to the extent he sought exclusion of the TMR Report.  *Id.*  According to the district court, Brinker's destruction of evidence, although grossly negligent, was not intentional.  *Id.*  The district court agreed with Brinker that the TMR Report was authentic and accurate, and that there was no indication that there were additional emails that would have supported Kean's position.  *Id.*  Thus, Kean's prejudice from the destruction of evidence was minimal, and an order for fees and costs was sufficient to cure that prejudice under Federal Rule of Civil Procedure 37(e)(1).

The district court then granted Brinker's motion for summary judgment and denied Kean's motion for summary judgment.  Applying the *McDonnell Douglas* framework, the district court found that, although Kean could establish a prima-facie case of age discrimination, he could not rebut Brinker's legitimate, nondiscriminatory reason:  Chili's "culture."  *Id.* at *21–27.  As for the prima-facie case, Kean met his burden because he was fifty-nine years old, he was replaced by a substantially younger Bean, and the decisionmakers had interacted with both Kean and Bean enough to understand that they were replacing Kean "with a substantially younger employee."  *Id.* at *22–23.  As for Brinker's proffered reason for terminating Kean, the district court credited that "culture" is important to Chili's and that the TMR Report provided sufficient evidence that Kean was creating a toxic culture at his restaurant.  *Id.* at *23.

The bulk of the district court's analysis of Kean's ADEA claim concerned pretext.  *Id.* at *23–26.  In sum, the district court found that although "Kean's termination was unfair and poorly documented," Kean had not sufficiently rebutted Brinker's proffered rationale.  *Id.* at *26. "More to the point, there [was] absolutely no evidence suggesting that the termination was because of Kean's age."  *Id.*  The district court rejected Kean's argument that non-decisionmaker employees called him old, observations that Brinker was systematically replacing older employees with younger ones, and that Brinker sought to reach a younger market through hiring and employing younger employees was probative.  *Id.*  In short:  "nothing in the record suggest[ed] that the decision to terminate [Kean] was based on anything other than a perception that he was not fostering the desired culture."  *Id.* at *25.

For these same reasons, the district court denied Kean's motion for summary judgment in his favor. *Id.* at \*27.

## II.  DISCUSSION

This appeal presents three issues, two of which are primary because their resolution dictates the result of the final issue.  First, Kean challenges the authenticity and accuracy of the TMR Report.  Second, Kean argues that the district court abused its discretion by refusing to order more severe sanctions for Brinker's spoliation, including exclusion of the TMR Report.  Finally, Kean urges the panel to reverse the district court's grant of summary judgment.

For the reasons that follow, we hold that the TMR Report is inadmissible, vacate the district court's order on sanctions, and reverse and remand the district court's order on Brinker's summary judgment motion.  Finally, we affirm the district court's decision denying Kean's motion for summary judgment.

## A.  Evidentiary Issues Posed by the TMR Report

We hold that Kean did not forfeit his evidentiary argument and that he has established that the TMR Report is inadmissible under Federal Rule of Evidence 901.

### 1.  Forfeiture

The first issue is whether Kean's arguments on appeal concerning the Federal Rules of Evidence were adequately preserved in the district court.  "The Sixth Circuit has repeatedly held that 'an argument not raised before the district court is waived on appeal.'"  *Kitchen v. Whitmer*, 106 F.4th 525, 536 (6th Cir. 2024) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008)).

As Kean points out, he made an evidentiary objection to the TMR Report in passing in his motion for sanctions.  Specifically, in a footnote included in his memorandum, Kean argued that there were "independent grounds" outside of his request for sanctions, "under which this [TMR Report] is inadmissible."  R. 34 (Mem. in Supp. Mot. for Sanctions at 7 & n.33) (Page ID #140).  "[N]o party can testify as to [the TMR Report's] accuracy," he stated.  *Id.* at 7 n.33.  No party was familiar with the report, Brinker's Rule 30(b)(6) deponent (Kissel) had never seen a

document like the TMR Report, and Kissel's "testimony makes clear that Defendants cannot authenticate it." *Id.* Kean then reiterated these arguments in his opposition to Brinker's motion for summary judgment. R. 48 (Kean Opp. to Mot. for Summ. J. at 8 & n.79) (Page ID #1087). Brinker responded to this argument by producing a declaration from Senior Manager TMR Kristen Abraira to attest to the authenticity and accuracy of the TMR Report. R. 36 (Opp. to Mot. for Sanctions at 6–7) (Page ID #422–23); *see also* R. 38 (Abraira Decl. ¶¶ 1, 4–5, 15) (Page ID #467–69). Following briefing, the district court addressed these arguments as part of its decision on Kean's motion for sanctions. *Kean*, 2024 WL 1815346, at *2, *6–7, *10–11.

Forfeiture is not appropriate in these circumstances. The purpose of the forfeiture rule is "to correct errors raised and addressed below, not to entertain new claims raised for the first time on appeal." *Greco v. Livingston County*, 774 F.3d 1061, 1064 (6th Cir. 2014). Issue-preservation rules serve important purposes. The rules "ease 'appellate review by having the district court first consider the issue.'" *Kitchen*, 106 F.4th at 536 (quoting *Scottsdale*, 513 F.3d at 552). "The rules also ensure 'fairness to litigants by preventing surprise issues from appearing on appeal.'" *Id.* at 537 (quoting *Scottsdale*, 513 F.3d at 552). Applying these rationales, Kean's arguments before the district court satisfy "the prudential concerns underlying our forfeiture and waiver rules." *Id.* at 536.

Kean objected to the TMR Report early in the litigation, preserved the argument in a motion, and prompted Brinker to respond to the objections, and the district court ultimately resolved the dispute. Although Kean has altered the form of his evidentiary objection—by giving it greater clarity through the Federal Rules of Evidence—the substance of his objection has remained the same: the TMR Report cannot be authenticated and is inaccurate. *See Patton v. Fitzhugh*, 131 F.4th 383, 393 (6th Cir. 2025) ("An argument is not forfeited on appeal because a . . . strain of the argument was not raised below, as long as the issue itself was properly raised." (alteration in original) (quoting *Mills v. Barnard*, 869 F.3d 473, 483 (6th Cir. 2017)).

Kean first challenged the authenticity and accuracy of the TMR Report during his deposition of Kissel. R. 34-11 (Rule 30(b)(6) Dep. at 75:8–79:17, 81:4–82:4, 116:1–14) (Page ID #297–304). Kean then incorporated these arguments in his motion for sanctions. R. 34 (Mem. in Supp. of Mot. for Sanctions at 7 & n.33) (Page ID #140). Not only did Brinker

respond to the substance of these objections in its opposition to Kean's motion for sanctions, R. 36 (Opp. to Mot. for Sanctions at 6–7) (Page ID #422–23), but also Brinker sought additional evidentiary support, R. 38 (Abraira Decl.) (Page #467). In this context, it is hard to argue that Brinker was not on notice that Kean had problems with the authenticity and accuracy of the TMR Report. To the extent the court's forfeiture rules address ease of appellate review by having the district court take the first crack at resolving a dispute, the district court did so here. *Kean*, 2024 WL 1815346, at *2, *6–7, *10–11.

### 2. Authentication

We turn now to the substance of Kean's evidentiary objection. We agree with Kean that the TMR Report is inadmissible under the Federal Rules of Evidence because Brinker cannot authenticate the TMR Report under Federal Rule of Evidence 901.

"Under Rule 901 of the Federal Rules of Evidence, the authentication of evidence is 'a condition precedent to admissibility.'" *United States v. Hall*, 20 F.4th 1085, 1104 (6th Cir. 2022) (quoting *United States v. Fults*, 639 F. App'x 366, 373 (6th Cir. 2016)). "To satisfy [this requirement], the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018) (alteration in original) (quoting Fed. R. Evid. 901(a)).

Brinker claims that Stofer authored the TMR Report. *See* Kean Br. at 40; *see also* Brinker Br. at 35–36; R. 38 (Abraira Decl. ¶¶ 7–8). Unfortunately, Stofer testified that she has "no independent recollection of Jeff Kean's employment or termination or [her] involvement in it." R. 45-3 (Stofer Decl. ¶ 4) (Page ID #1041). As for the TMR Report that she apparently authored, she has "no independent recollection of the subject matters or items being discussed in it." *Id.* ¶¶ 5–6 (Page ID #1041). Stofer effectively disclaims authorship of the document, only going so far as to "recognize" that she left "comments" on at least two pages, while stating that she had "no recollection of the factual basis underlying [her] comments." *Id.* ¶ 6 (Page ID #1041). This is insufficient evidence to support a finding that the TMR Report is what Brinker claims it to be. Stofer has no independent recollection of authoring the document, nor does she have any independent recollection of the facts underlying the document.

There is no real debate that Stofer cannot authenticate a document she has no recollection of authoring. The parties primarily dispute whether Abraira can authenticate the TMR Report. *See* Brinker Br. at 35–36; Reply at 10–12. Abraira attests that "[t]he TMR Report contains an exact reproduction of the substance of the emails regarding Plaintiff's termination," that she "ha[s] personal knowledge of the facts contained" in her declaration, and that the TMR Report "accurately captures all documentation . . . ." R. 38 (Abraira Decl. ¶¶ 1, 4–5, 15) (Page ID #467–69). It is unclear to us, however, how Brinker can use Abraira's declaration to establish that she is "someone with knowledge of the evidence offered" for purposes of authenticating the TMR Report. *United States v. Dunnican*, 961 F.3d 859, 872 (6th Cir. 2020) (quoting *Farrad*, 895 F.3d at 876).

Abraira did not author the document, she did not witness its creation, and she has not stated that she discussed its creation with others. On authorship, Abraira has not stated that she authored the document. Nor has Abraira stated that she witnessed the creation of the TMR Report. *See* R. 38 (Abraira Decl. ¶ 8) (Page ID #468). Nor has Abraira attested that she spoke with Stofer about the TMR Report. Nor has Stofer stated in her declaration that she spoke with Abraira about the document's creation. R. 45-3 (Stofer Decl. ¶¶ 4–5) (Page ID #1041). There is no evidence from which we could even infer that Abraira witnessed the document's creation or discussed it with Stofer—for instance, if Abraira stated that her years of employment overlapped with Stofer. Thus, Brinker cannot establish that Abraira's declaration can satisfy any of its proffered bases for authentication.

As Kean points out, it is hard to believe that Abraira could have personal knowledge about the facts contained within the TMR Report. Kean Br. at 41. The original emails were destroyed years ago. Nor could she authenticate the TMR Report—as we have explained above. Not to mention that Brinker's Rule 30(b)(6) witness could not explain the origin of the TMR Report. R. 34-11 (Rule 30(b)(6) Dep. at 75:8–79:17, 81:4–82:4, 116:1–14) (Page ID #297–304). Brinker's lack of a document-retention policy and subsequent failure to implement a litigation hold has contributed almost exclusively to this gap in the record.

There are also reasons to be concerned about the accuracy of the information contained within the TMR Report.

First, it appears from the face of the TMR Report that the information is incomplete. For example, one message states without attribution: "Thank you KS!" R. 34-10 (TMR Report at 6) (Page ID #281). There is no indication about who wrote this message or when it was sent. Other portions of the TMR Report look like notes. *See id.* at 5 (Page ID #280). It is not always clear which portions of the TMR Report are notes, draft emails, or exchanged emails. It is troubling that the document itself raises concerns about its authenticity and accuracy. *Cf. Moyer v. Gov't Emps. Ins. Co.*, 114 F.4th 563, 568–70 (6th Cir. 2024) (reversing a district court decision dismissing a complaint because the district court improperly relied on documents with authentication issues like multiple redlines, handwritten additions, missing pages, incorrect page numbers, displayed metadata, and incomplete dates).

Second, also troubling is the possibility that emails were exchanged between relevant parties that were not included in the TMR Report. S*ee Kean*, 2024 WL 1815346, at *11. No one can accurately state that the TMR Report contains all of the emails related to Kean's termination. Brinker destroyed all original documents. Perhaps these emails would have supported Brinker's position that Kean had "culture" problems. Perhaps these emails would have supported Kean's argument that Brinker fired him because of his age. At this point, no one could know with any certainty.

Accordingly, we hold that the TMR Report is inadmissible because it cannot be authenticated under Rule 901.

## B. Motion for Sanctions

We turn now to the district court's resolution of Kean's spoliation motion. We vacate the district court's order and instruct it to consider whether additional sanctions beyond exclusion of the TMR Report are appropriate.

Brinker does not dispute that the district court correctly found that it spoliated evidence. Brinker Br. at 55–57. The dispute is only whether the district court's award limited to a remedy consisting solely of fees and costs in addressing spoliation was an abuse of discretion. "We review for abuse of discretion the district court's decision to impose sanctions for evidence spoliation." *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010). Federal Rule of

Civil Procedure 37(e) governs the spoliation of electronically stored information.  Kean asks that the panel hold that the district court's sanction of fees and costs damages was inappropriate to the extent it did not order more severe sanctions, and to "remand so the district court can determine an appropriate sanction beyond fees and costs."  Kean Br. at 60.  In light of our holding on the admissibility of the TMR Report, we grant Kean's request.

A district court has two options for imposing sanctions pursuant to Rule 37(e).  Under Rule 37(e)(1), "upon finding prejudice to another party from loss of the information, [the district court] may order measures no greater than necessary to cure the prejudice."  Or, under Rule 37(e)(2), "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," the district court may "presume that the lost information was unfavorable," "instruct the jury that it may or must presume the information was unfavorable," or "dismiss the action or enter a default judgment."

We start with Rule 37(e)(2)'s more limited set of remedies.  The district court found that Brinker was "apparently grossly negligent" in failing to preserve the relevant emails and other personnel documents from the relevant time period.  *Kean*, 2024 WL 1815346, at *14.  Given that Brinker failed to preserve these documents, did not maintain a records-retention policy at the time, and did not institute the litigation hold until April 2019, the district court's finding of gross negligence—short of intentional destruction—was not an abuse of discretion.  Because Brinker's conduct was only grossly negligent—and not intentional—the district court did not abuse its discretion in declining to enter sanctions pursuant to Rule 37(e)(2).  *See Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016).

Now we turn to Rule 37(e)(1).  *Kean*, 2024 WL 1815346, at *11–12.  In ordering monetary sanctions, the district considered that "the TMR Report in this case appears to capture the substance of the discussion that led to the plaintiff's termination."  *Id.* at *11.  For the reasons already explained, the TMR Report does not capture the substance of the discussion, and the district court abused its discretion in relying on the report.  As a consequence, we vacate its order, and instruct the district court to consider on remand whether additional sanctions beyond fees and costs are appropriate in light of our evidentiary ruling.

## C. Brinker's Motion for Summary Judgment

For the reasons that follow, we reverse the district court's order granting Brinker's motion for summary judgment. Kean has offered sufficient evidence of age discrimination to rebut Brinker's proffered nondiscriminatory reason for terminating Kean: Chili's "culture."

"We review de novo a grant of summary judgment, construing the evidence 'in the light most favorable to the nonmoving party . . . .'" *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (alteration in original) (quoting *Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023)). "A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A 'genuine dispute' exists if the nonmoving party presents 'sufficient evidence from which a jury could reasonably find' in its favor." *Id.* (quoting *Troutman v. Louisville Metro. Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020)). "The same standard applies when the parties have filed cross-motions for summary judgment—each motion is evaluated by reading the evidence and resolving any doubts in favor of the nonmovant." *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014).

"The ADEA prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (quoting 29 U.S.C. § 623(a)(1)); *accord Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020). "To succeed on a disparate-treatment claim under the ADEA, a plaintiff must show, by a preponderance of the evidence, that age was the 'but-for' cause of an adverse employment decision." *McNeal v. City of Blue Ash*, 117 F.4th 887, 894 (6th Cir. 2024) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–78 (2009)). To defeat Brinker's motion for summary judgment, Kean "must show a genuine dispute of material fact that, if resolved in [his] favor, could persuade a reasonable juror that age was the but-for cause of [his] termination." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

"A plaintiff may present either direct or indirect evidence to prove an ADEA violation." *Willard*, 952 F.3d at 806. "'Direct evidence is evidence that proves the existence of a fact

without requiring any inferences' to be drawn." *Pelcha*, 988 F.3d at 324 (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). "Indirect or circumstantial evidence 'allow[s] a factfinder to draw a reasonable inference that discrimination occurred.'" *Willard*, 952 F.3d at 807 (alteration in original) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)). Kean offers indirect evidence of age discrimination. "ADEA claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework." *Willard*, 952 F.3d at 807.

Under the *McDonnell Douglas* framework, "[f]irst, the plaintiff must produce 'evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination' before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 807 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). "Then, the plaintiff must rebut the proffered reason by producing 'evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *Id.* (quoting *Blair*, 505 F.3d at 524).

"We have explained that '[o]n a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390–91 (6th Cir. 2009) (alteration in original) (quoting *Blair*, 505 F.3d at 524).

### 1. Prima-Facie Case

For the same reasons as the district court, we hold that Kean has established a prima-facie case of age discrimination.

"A plaintiff establishes his prima facie case by showing that (1) he is a member of a protected group, (2) he was qualified for the position in question, (3) his employer took an adverse employment action against him, and (4) there are 'circumstances that support an inference of discrimination.'" *Willard*, 952 F.3d at 808 (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)). "The plaintiff's burden to establish a prima facie case is light, one 'easily met' and 'not onerous.'" *Id.* (quoting *Provenzano v. LCI Holdings, Inc.*, 663

F.3d 806, 813 (6th Cir. 2011)).  "The sole function of the prima facie stage of the burden-shifting framework is 'to raise a rebuttable presumption of discrimination by eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff],' such as the plaintiff is unqualified for the position or not a member of the protected group."  *Id.* (alterations in original) (quoting *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)).

We agree with the district court that "the record is clear that Kean was over age 40 when he was terminated, that he was well qualified for his position, and that he was replaced by Bean, who was substantially younger."  *Kean*, 2024 WL 1815346, at \*22.  "[T]he decisionmakers had met and interacted with [Kean] prior to the termination, putting them in a position to know his approximate age, and . . . they replaced him with a substantially younger employee."  *Id.* at \*23.  "[A]s a matter of common sense, advanced middle age, like race and gender, is typically a rather obvious condition.  Likewise, one meeting with Bean, then in his early 30s, likely would have been sufficient to permit Gilbert to verify that he was significantly younger than the plaintiff."  *Id.* at \*22 n.26.

Brinker's reliance on *Woodman v. WWOR-TV, Inc.* does not persuade us otherwise.  Brinker Br. at 25 (citing 411 F.3d 69, 90 (2d Cir. 2005)).  The plaintiff in *Woodman* sought to establish a prima-facie-age-discrimination claim where the termination decision was made "by officials of an acquiring company who had apparently never met her or reviewed her personnel file."  411 F.3d at 80.  The employer's obliviousness to the plaintiff's age meant that the employer could not have discriminated against her based on age, and so the prima facie case failed.  *Id.* at 90.  But *Woodman* was based on facts that are unlike those in our case.  Here, it is undisputed that Gilbert and Kissel had met Kean prior to terminating him.  *Kean*, 2024 WL 1815346, at \*22.  Even if neither Kissel nor Gilbert knew Kean's exact age, both had spent enough time with him to "guess his approximate age" just by looking at him, as the district court found.  *Id.*

For these reasons, Kean has met his burden to establish a prima-facie claim of age discrimination.

**2. Legitimate, Non-Discriminatory Reason**

The burden now shifts to Brinker to offer legitimate, non-discriminatory reasons for Kean's termination. Brinker offers one reason, that it terminated Kean because of his restaurant's "culture." Brinker Br. at 27. We assume without deciding that Brinker has established its burden to assert a nondiscriminatory reason based on Kean's independent recollection of relevant events.

**3. Pretext**

We diverge with the district court's decision on pretext. Because the TMR Report is not admissible, the district court erred by relying on it. Without the TMR Report to explain its asserted nondiscriminatory reason for terminating Kean, Brinker has little evidentiary support for its position that it fired Kean because of the "culture" at his restaurant. In this context, Kean has provided sufficient evidence of pretext to rebut Brinker's explanation.

"An employee may show that an employer's proffered reason for terminating him was pretext by demonstrating that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Willard*, 952 F.3d at 810 (quoting *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 539 (6th Cir. 2014)).

"We 'consider all evidence in the light most favorable to the plaintiff, including the evidence presented at the prima facie stage.'" *Id.* (quoting *Provenzano*, 663 F.3d at 812). "The plaintiff must 'produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it fired [him].'" *Id.* (alterations in original) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "In order 'to survive summary judgment, a plaintiff need only produce enough evidence to . . . rebut, but not disprove, the defendant's proffered rationale.'" *Id.* (alteration in original) (quoting *Blair*, 505 F.3d at 532). "At this stage, the plaintiff must show that he can meet his burden of persuasion to demonstrate impermissible bias was the but-for cause of his discharge." *Id.*

Because the TMR Report is inadmissible, resolution is simple.  Kean has provided sufficient evidence to rebut Brinker's asserted nondiscriminatory reason.  The primary evidence in support of Kean's claim is his own recollection about the circumstances of his termination.  Kean was replaced with a much younger employee, and Brinker has little evidence to support its "culture" rationale.  Resolution of this dispute requires evaluation of Kean's credibility, which is appropriate for resolution by a trier of fact.  Moreover, other evidence supports Kean's rebuttal.

First, despite stating that "culture" was the reason for Kean's termination, Brinker did not rely on any of its objective metrics for evaluating "culture."[6]  In October 2018, Kean's restaurant "was ranked as the 3rd highest performing store in [his] market."  R. 34-3 (Mallindine Decl. ¶ 7) (Page ID #188).  "These metrics included employee turnover, sales, guest experience, and cost." *Id.* ¶ 6 (Page ID #188).  Kean's ratings by his employees were also positive.  *Id.* ¶¶ 8–9, 16, 23–24 (Page ID #188–89).  Kean's assistant manager at the time, Eric Bean, confirms that the restaurant "was a top performing store in its market in terms of the metrics used by Brinker" during the relevant time period.  R. 34-4 (Bean Decl. ¶ 5) (Page ID #191).  "[F]rom June 27 to end of December of 2018"—with Kean's termination on November 27, 2018—"[b]ased upon all KPI indicators including turnover, sales, guest experience, and cost, [Kean's restaurant] was the second highest performing store in the market . . . ."  *Id.* ¶ 11 (Page ID #192).  Bean's declaration also supports the view that Kean had positive relationships with his employees.  *Id.* ¶¶ 4, 13–14, 20–21 (Page ID #191–93).

Kean's efforts at creating a positive environment at his restaurant are reflected in his May 2018 MEE survey, which was completed by forty-six employees.  R. 48-12 (MEE Survey at 1–2) (Page ID #1336–37).  Kean apparently exceeded every objective managerial benchmark set by Chili's for a MEE survey.  *Id.* at 1 (Page ID #1336).  In the subjective/qualitative portion, entitled "**Culture Comment**," employees left mostly positive reviews of Kean ("Cared for," "Thriving," "positive," "Fun," "Fair," "Family," etc.)—mirroring his objective scores.  *Id.* at 2 (Page ID #1337).  This information squarely contradicts Brinker's "culture" rationale to the extent that "culture" considers a store's sales, employee experiences, and guest experiences.

---

[6]Kean did not forfeit this argument.  *See* R. 48 (Kean Opp. to Mot. for Summ. J. at 6–7, 9, 14–15, 18) (Page ID #1085–86, 1088, 1093–94, 1097).

Evidence contradicting an employer's proffered reason can satisfy a plaintiff's burden to rebut that reason. *See Alexander v. CareSource*, 576 F.3d 551, 565 (6th Cir. 2009); *see also Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 513 (6th Cir. 2021).

Second, Brinker did not appear to follow its own policy and procedures in terminating Kean.[7]  Although "'an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext[,]' . . . [w]e have held that failure to uniformly apply a progressive discipline policy can be evidence of pretext, especially when the company asserts that policy as a rationale for the employee's termination." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) (quoting *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)).  Therefore, any failure on Brinker's part to follow its progressive-discipline policy, while not enough on its own to establish pretext, can be considered as part of the constellation of evidence.

Finally, Kean has produced evidence that Brinker was cultivating a youthful "culture" at Chili's that Kean did not fit into.  Both Bean and Mallindine stated that during their time at Chili's, "there seemed to be a trend of more senior employees leaving . . . and younger employees being promoted or hired into management."  R. 34-3 (Mallindine Decl. ¶ 29) (Page ID #189); R. 34-4 (Bean Decl. ¶ 46) (Page ID #195).  Kean said the same thing.  R. 48-1 (Kean Dep. at 33:16–34:8, 44:6–22) (Page ID #1117–18, 1127).  Kean was also one of the oldest managers in the region and reported that he would receive comments about his age from other GMs like "Old Man," "Pops," "Grandpa," and that his management style was "old-school." *Id.* at 34:21–35:7, 37:6–11 (Page ID #1118–19, 1121).  Although none of these comments were made by relevant decisionmakers, Kean understood them to mean that "the old-school methods of management would no longer work with the younger group of employees the defendants were hiring . . . ." *Id.* at 37:21–38:5 (Page ID #1121–22).  Moreover, "[w]e have held that discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext." *Risch*, 581 F.3d at 393 (citing *Ercegovich*, 154 F.3d at 356–57).

---

[7]Kean did not forfeit this argument. R. 48 (Kean Opp. to Mot. for Summ. J. at 5–7 (Page ID #1084–86).

Ultimately, though each independent effort to rebut Brinker's rationale might not be enough on its own, the combination of the pieces of evidence shows that Kean has met his burden to rebut Brinker's legitimate, nondiscriminatory reason.

### 4. Business-Judgment/Honest-Belief Rule

As Brinker points out, even if Kean has provided enough evidence to create a genuine issue of material fact regarding the reasons for his termination, Brinker may nevertheless be entitled to summary judgment under the honest-belief rule. *Blizzard*, 698 F.3d at 286. "The rationale behind the [honest-belief] rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 380 (6th Cir. 2017) (alteration in original) (quoting *Smith v. Chrysler Corp.*, 115 F.3d 799, 806 (6th Cir. 1998)).

For all the reasons already discussed, without the TMR Report, Brinker cannot establish that it made a reasonably informed and considered decision before terminating Kean. Accordingly, Brinker cannot invoke the honest-belief defense as a matter of law.

## D. Kean's Motion for Summary Judgment

We also affirm the district court's decision denying Kean's motion for summary judgment. Although Kean timely appealed the district court's order denying his motion for summary judgment, R. 62 (Notice of Appeal at 1) (Page ID #1702), he has made no argument before us regarding this aspect of the district court's decision. Accordingly, Kean has forfeited any potential challenge to the district court's decision on the merits. *See Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 843 (6th Cir. 2024).

## III. CONCLUSION

For these reasons, we **VACATE AND REVERSE IN PART** and **AFFIRM IN PART** the district court's order and **REMAND** for proceedings consistent with this decision.